UNITED STATES DISTRICT COURT

DISTRICT OF VERMONT

2023 DEC -8 AM 11: 20

CLERK

BY_____

DEPUTY CLERK

ALLCO FINANCE LIMITED, CHELSEA
SOLAR LLC and APPLE HILL SOLAR
LLC

Plaintiffs,

v.

ANTHONY ROISMAN, RILEY ALLEN
and MARGARET CHENEY, in their official
capacities as commissioners of the Vermont
Public Utility Commission.

Defendants.

Case No.

2:23.cv-691

**COMPLAINT**

1.      Plaintiffs Allco Finance Limited ("Allco"), Chelsea Solar LLC ("CS") and Apple
Hill Solar LLC ("AHS") by and through their undersigned attorney hereby seek declaratory and
injunctive relief and damages, stating as follows in support.

2.      This case involves an enforcement action under section 210(h)(2) the Public Utility
Regulatory Policies Act, Pub. L. No. 95-617, 92 Stat. 3117 ("PURPA"), 16 U.S.C. §824a-3(h)(2).
This Court has jurisdiction under 16 U.S.C. §824a-3(h)(2), which empowers the District Court to
issue injunctive or other relief upon complaint of a "qualifying small power producer," and under
28 U.S.C. §1331 because claims arise under the Supremacy Clause.[1]  This case also brings claims
under the Takings Clause of the Fifth and Fourteenth Amendments to the United States
Constitution.

**FACTUAL BACKGROUND**

3.      Section 210 of PURPA requires electric utilities to buy *all* the power produced by
alternative energy generators known as Qualifying Facilities ("QFs").[2]  18 C.F.R. §292.303(a).

---

[1] Under 16 U.S.C. §824a-3(h), in any enforcement action the rules under Section 210 of PURPA
are treated as rules under the Federal Power Act, 16 U.S.C. §791a *et seq.*

[2] "[Q]ualifying small power production facilit[ies]" under the statute and "Qualifying Facilities"
or "QFs" under regulations of the Federal Energy Regulatory Commission, *see* 16 U.S.C.
§796(17)(C); 18 C.F.R. §292.203.

And it requires these utilities to pay the same rate they would have if they had obtained that energy from a source other than the QFs. 18 C.F.R. §292.304. QFs are guaranteed their choice of this "avoided cost" rate as calculated either at the time of contracting or the time of delivery. 18 C.F.R. §292.304(d)(2). Plaintiffs are developers and operators of QFs.

4.     To regulate the terms under which electric utilities purchase power from QFs, the Vermont Public Utility Commission ("VPUC") established the Standard Offer program pursuant to 30 V.S.A. §8005a. The Standard Offer Program violates PURPA's requirements, *inter alia*, because it (i) purports to redefine the size of a QF under PURPA in Vermont, (ii) bars the use of the Federal Energy Regulatory Commission's ("FERC's") least-cost interconnection cost responsibility for a QF's interconnection cost, and (iii) empowers the VPUC to exclude all non-hydroelectric QFs greater than 2.20 megawatts ("MWs") from participating.

5.     Section 210(h)(2)(B) of PURPA "permits any ... qualifying small power producer to petition FERC to enforce PURPA against a State regulatory authority or nonregulated electric utility and, if FERC does not initiate an enforcement action, to bring an action in district court to require such State regulatory authority or nonregulated electric utility to comply with PURPA." *Niagara Mohawk Power Corp. v. FERC,* 306 F.3d 1264, 1268 (2d Cir. 2002) (Internal quotations and citations omitted.)

6.     Plaintiffs are qualifying small power producers who petitioned the FERC to enforce PURPA against the VPUC.  FERC declined, *see, Allco Finance Limited,* 185 FERC ¶ 61,006 (2023), so Plaintiffs bring this suit.

**Statutory and Regulatory Framework.**

**A.     Congress Enacts PURPA to Incentivize Power Development.**

7.     PURPA was enacted to overcome the reluctance of traditional electric utilities to purchase power from and to sell power to non-traditional facilities like Allco's. *Winding Creek Solar LLC v. Peterman*, 932 F .3d 861, 863 (9th Cir. 2019) ("*Winding Creek*") (citing *Indep. Energy Producers Ass'n, Inc. v. Cal. Pub. Utils. Comm'n*, 36 F.3d 848, 850 (9th Cir. 1994)). PURPA addressed that problem by requiring electric utilities to purchase power from "qualifying

small power production facilities," 16 U.S.C. §824a-3(a), which include facilities designed to produce electricity solely through the use of a renewable fuel source, such as Plaintiffs' facilities. *Winding Creek*, 932 F.3d at 863; *see also FERC v. Mississippi*, 456 U.S. 742, 760-761, 102 S. Ct. 2126, 72 L. Ed. 2d 532 (1982) ("The statute's substantive provisions require electricity utilities to purchase electricity from, and to sell it to, qualifying cogenerator and small power production facilities.").

8.    Under PURPA section 210(a) through (e), 16 U.S.C. §824a-3(a)-(e), the FERC is required to adopt rules governing implementation of PURPA's must-purchase obligation, and to define methods for calculating the avoided-cost rates at which such purchases must occur. Under section 210(f), 16 U.S.C. §824a-3(f), States are required to enforce PURPA against the utilities they regulate in accordance with the implementation rules adopted by FERC.

**B.    FERC Adopts Rules Setting Requirements for States to Implement PURPA.**

9.    To carry out the statute's directive, FERC enacted regulations requiring that "[e]ach electric utility shall purchase . . . any energy and capacity which is made available from a qualifying facility . . . [d]irectly to the electric utility." 18 C.F.R. §292.303(a). A utility's obligation to purchase all output from a qualifying facility is known as a "legally enforceable obligation," (a "LEO") or as the Ninth Circuit describes it—PURPA's "must-take" obligation. *See Winding Creek*, 932 F.3d at 865. Once the utility's LEO or "must-take" obligation is triggered, which is what occurred between the Plaintiffs and VEPP Inc. ("VEPP") in 2013, the utility becomes bound to purchase all electricity the qualifying facility produces. *See Order 69,* Small Power Production and Cogeneration Facilities; Regulations Implementing Section 210 of the Public Utility Regulatory Policies Act of 1978, 45 Fed. Reg. 12,214 at 57 (Feb. 25, 1980) (A legally enforceable obligation is created when "*the qualifying facility has agreed to obligate itself to deliver at a future date energy and capacity to the electric utility.*") (Emphasis supplied).[3] The LEO concept has been a cornerstone of PURPA since enactment. *See FLS Energy, Inc.*, 157 FERC

---

[3] Available at https://www.ferc.gov/sites/default/files/2020-04/order-69-and-erratum.pdf (last visited November 27, 2023).

¶61,211, P24 (2016) ("The Commission has explained that the term 'legally enforceable obligation' is broader than simply a contract between an electric utility and a QF, and that a state may not limit the methods through which a legally enforceable obligation may be created to only a fully executed contract. . .. The Commission explained in *JD Wind 1 LLC*, 130 FERC ¶61,127 (2010), that *the establishment of a legally enforceable obligation turns on the QF's commitment, and not the utility's actions*[.]") (Emphasis added) (footnote omitted).

## C.    FERC Sets Forth How to Establish Avoided Costs.

10.    PURPA also directs FERC to promulgate rules ensuring that "in requiring any electric utility to offer to purchase electric energy from any . . . qualifying small power production facility, the rates for such purchase" shall not "exceed[] the incremental cost to the electric utility of alternative electric energy." 16 U.S.C. §824a-3(b). FERC's regulations carrying out that directive provide that "[r]ates for purchases from new capacity" – that is, from facilities constructed after PURPA's enactment, §292.304(b)(1) – must be equal to, and not less than, the utility's avoided costs. *Id.* §292.304(b)(4).

11.    FERC's regulations also detail the methodologies that must be used in determining a utility's avoided costs and provide that the QF has the option to choose which of two methodologies shall be used in calculating the utility's avoided costs. *Id.* §292.304(d). When a qualifying facility provides "energy or capacity pursuant to a legally enforceable obligation for the delivery of energy or capacity over a specified term, . . . the rates for such purchases shall, *at the option of the qualifying facility* exercised prior to the beginning of the specified term, be based on either: (i) The avoided costs calculated at the time of delivery; or (ii) The avoided costs calculated at the time the obligation is incurred." *Id.* §292.304(d)(2) (emphasis added).

12.    The first methodology – "[t]he avoided costs calculated at the time of delivery," *id.* §292.304(d)(2)(i) – is known in the industry as a "short run avoided cost" ("SRAC") rate, because it can be determined only at the moment that electricity is delivered. Typically, SRAC is calculated on a month-to-month basis and depends in part upon the fluctuating market price of natural gas or coal. The second methodology – "[t]he avoided costs calculated at the time the obligation is

incurred," *id.* §292.304(d)(2)(ii) – is known in the industry as a "long run avoided cost" ("LRAC") rate because it is determined at the time the utility incurs the purchase obligation and is determined for the entire duration of the contract term. A utility's LRAC is typically calculated through the use of a mathematical model that projects the utility's anticipated avoided costs in the future.

13.     Both the "must-take" obligation and avoided-cost rates are federal obligations which can be enforced in state court under section 210(g) of PURPA. 16 U.S.C. §824a-3(g)(2); *FERC v. Mississippi,* 456 U.S. at 760 ("state courts have a unique role in enforcing the body of federal law, . . . the state courts [are] directed to heed the constitutional command that the policy of *the federal Act is the prevailing policy in every state* [] and should be respected accordingly in the courts of the State") (internal citations and quotations omitted) (emphasis added).

**D.     Vermont's Implementation of PURPA.**

14.     FERC's PURPA rules, including the requirement that utilities and Vermont's purchasing agent honor any LEO to purchase power from a QF, are the baseline PURPA requirements in every state, and require Vermont to enforce those obligations against the utilities it regulates. *FERC v. Mississippi,* 456 U.S. at 760 ("the policy of the federal Act is the prevailing policy in every state.")

15.     The VPUC oversees two types of interstate wholesale electricity programs with a QF—Vermont's Standard Offer program, which is at issue here, *see*, 30 V.S.A. §8005a, and VPUC Rule 4.100, which is entitled Small Power Production and Cogeneration.

16.     In 2009, the Vermont Legislature enacted 30 V.S.A. §8005a establishing the Standard Offer program under which contracts would be issued to renewable energy QF generators for the purchase of electricity from renewable energy projects. The Standard Offer program requires VEPP, on behalf of all of Vermont's utilities, to enter into long-term fixed rate contracts for the purchase of electricity and environmental attributes from renewable energy generators that are sized 2.2 MWs or smaller, except a larger limit of 5MWs applies to hydroelectric facilities. In the case of solar energy facilities, the contract term would be twenty-five years.

17.     Like any utility-type generation project, a small solar QF requires a fixed and

predictable stream of income in order to finance construction. When first implemented, the price paid for each kilo-watt hour ("kwh") of electricity under the Standard Offer program was set administratively by the VPUC. The program had an initial capacity of 50MWs.

18.    In 2012, the Standard Offer capacity was expanded to 127.5 MWs for certain QFs (including solar QFs), and was *uncapped* for some other non-solar QFs. The contracts representing the additional 77.5MWs would be given out over a period of 10 years. The number of contracts that would be issued each year would be capped, initially at 5MWs per year, then 7.5MWs, and finally at 10MWs.

19.    The Standard Offer is the only program in Vermont for a qualifying facility, such as Plaintiffs' QFs, to obtain the long-term rate and contract to which a QF is entitled under 18 C.F.R. §292.304(d)(2)(ii).

**The CS And AHS Generation Projects.**

20.    In 2013, Allco submitted a commitment to VEPP to sell all the energy and capacity from the Chelsea Solar and Apple Hill Solar projects, each a QF, and each with a nameplate capacity of 2.0MWs, creating a legally enforceable obligation. Contracts were executed by VEPP for each of the Chelsea Solar project, *see* **Exhibit A**, and the Apple Hill Solar project, *see* **Exhibit B**.

**The FERC's Interconnection Rules**.

21.    Both federal and state law apply with respect to the interconnection of electric generators to the GMP distribution system. The interconnections here for the Chelsea and Apple Hill solar projects are for the purpose of wholesale sales to all Vermont's utilities, not just GMP. The costs assessed to the QF must be necessary. "[W]hat is necessary for the interconnection of a customer is ultimately a factual question." *See, Jeffers South LLC v. Midwest Independent Transmission System Operator, Inc.,* 144 FERC ¶ 61,033 (2013) at P15. The costs must also be *directly* related to the installation and maintenance of the physical facilities necessary to permit interconnected operations with a QF. The costs must also be just, reasonable, and non-discriminatory. 16 U.S.C. §824a-3(c). The portion of the costs that can be allocated to the

6

generator are additionally limited to the excess over the amount GMP would incur if it engaged in the interconnection or a similar transaction itself. That, of course, is a factual question, too. 18 C.F.R. §292.101(b)(7)

## NATURE OF THE ACTION

22.     The Defendants have implemented a state law that (i) purports to redefine the size of a QF under PURPA in Vermont, (ii) bars the use of the FERC-mandated least-cost interconnection cost responsibility for a QF's interconnection cost, and (iii) empowers the VPUC to exclude all non-hydroelectric QFs greater than 2.20 MWs from participating in the Standard Offer implementation of PURPA. Thus, a 2.21MW solar QF is precluded from participation. Such an exclusion is impermissible under both the FERC's pre-2021 and the post-2020 PURPA regulations.[4]

23.     Making matters worse, the VPUC has weaponized the Standard Offer's definitions of "plant" and "plant capacity" (which themselves are simply an unabashed attempt to re-write federal law) to scuttle 2.2MW and under QFs that obtained legally enforceable obligations under PURPA and that have contracts with VEPP if those QFs have a reduced cost of interconnection because GMP followed FERC's interconnection rules when there are two adjacent facilities both owned by the same developer group, here the Plaintiffs.

24.     Thus, when the Chelsea Solar project was held by the VPUC to have satisfied all of Vermont's requirements for a construction permit,[5] in Vermont's lingo a certificate of public good ("CPG"), the VPUC said nope you're not getting it. We are scuttling your project because the adjacent Apple Hill solar project already paid GMP for a three-phase distribution line extension that also allows you to connect to the grid, and thus the two projects would "share infrastructure," even though the purported "shared" line upgrade was owned by the utility, GMP, and was the

---

[4] Because the relevant contracts at issue here were executed in 2013 and 2014, the FERC's post-2020 amendments to its PURPA regulations do not apply. On July 16, 2020, the FERC issued Order No. 872, 172 FERC ¶61,041 (2020) ("Order 872"), revising the FERC's regulations under section 210 of PURPA. The changes made by Order No. 872, took effect on December 31, 2020. *See* Order No. 872, 172 FERC ¶61,041 at ¶66; *id.* ¶1, fn. 1 ("we do not by this final rule permit disturbance of existing contracts or LEOs.")
[5] *See*, **Exhibit A**.

FERC-mandated least cost option (and was known to all in 2013, *see,* **Exhibit A** at 17, *before* the VPUC approved the Apple Hill Standard Offer contract).[6] Both CS and AHS relied on the VPUC's long-standing regulatory position and knowledge (known since 2013) that the CS and AHS line extension would be "shared," and thus invested millions of dollars in the CS and AHS projects. The VPUC's change of regulatory position, if not otherwise pre-empted (which it is) constitutes an unlawful taking under the Fifth and Fourteenth Amendments of the United States Constitution after Plaintiffs made their investments in reliance on the VPUC's regulatory position.

25.    Instead, the VPUC held that the Standard Offer PURPA contracts for each project were no good unless the Chelsea project built a new, redundant, duplicate three-phase line extension just like what was assessed to the Apple Hill project, or somehow was able to interconnect to older pre-existing three-phase lines. The VPUC's unlawful regulatory actions effectively imposes an unduly discriminatory tax or a toll on a QF's right to connect to the GMP *and* on its right to enforce its PURPA rights. The VPUC's unlawful regulatory actions purport to re-write the FERC's QF size rules, bars the use of the FERC-mandated least-cost interconnection cost responsibility for a QF's interconnection cost, and re-writes what QFs are entitled to PURPA rights, all contrary to federal law.

26.    In 2019, the VPUC denied CS a CPG solely because of the Defendants concluded that the CS project and the AHS project were a single 4.0MW project, and thus could not use their Standard Offer contracts because in the Defendants' view (which is wrong), a 4MW project is not entitled to a Standard Offer PURPA contract.

27.    Thus, the Defendants denied Chelsea and AHS of the legally enforceable obligation and contracts they obtained in 2013 under the Standard Offer program for their 2.0MW facilities. That is inconsistent with FERC's regulations under PURPA. The VPUC's restriction on a QF's entitlement to a LEO and Standard Offer contract because of the existence of an adjacent QF that

---

[6] *See,* **Exhibit B**, Chelsea (f/k/a Bennington Solar) PPA, p. 17 ("Chelsea Solar would require significant reconductoring and addition of phases to the point of interconnection. *These would be shared with Apple Hill* if constructed.") (Emphasis added.) The shared aspect of the new line extension was known from the get-go.

8

follows the FERC's and PURPA's interconnection rules is inconsistent with federal law and thus is pre-empted because it stands as an obstacle and imposes an unlawful condition on a QF's access to the LEO and contract to which a QF is entitled to under PURPA. Under PURPA it is unlawful to exclude a solar-QF over 2.2MWs from the Standard Offer program.

28.     The 2.2MW plant size limit is pre-empted and unlawful because Congress set the size limit at 20MWs or 80MWs (depending upon the context), and it is the regulation of a wholesale sale contract outside the limited authority granted by Congress.

29.     The 2.2MW plant size limit is also preempted and unlawful because non-solar QFs up to 5MWs in size can obtain Standard Offer contracts and there is no basis for such discriminatory treatment.

30.     The Defendants' aggregating the sizes of separate QFs in calculating the 2.2MW plant size limit is unlawful because (1) it conflicts with the FERC's interconnection standards, (2) it conflicts with the limited circumstances under which Congress does allow the aggregation of separate QFs under PURPA, (3) and it is the regulation of a wholesale sale contract outside the limited authority granted by Congress,  (4) a 4.0MW solar project would be entitled to the same LEOs and contracts obtained by CS and AHS, and (5) there is no basis for the discriminatory treatment of a solar QF under 5MWs as compared to other non-solar QFs under 5MWs that can receive Standard Offer contracts if they exceed 2.2MWs.

31.     The Plaintiffs appealed the VPUC's refusal to issue a CPG to the Vermont Supreme Court, which uses a *Chevron*[7] on steroids level of deference to the VPUC. *See, In re Derby GLC Solar, LLC*, 2019 VT 77, ¶18 ("When the PUC evaluates a CPG petition under 30 V.S.A. § 248,

---

[7] *Chevron USA Inc. v. Nat. Res. Def. Council*, 467 U.S. 837 (1984) ("*Chevron*"). *Chevron* deference implicates the constitutional separation of powers doctrine as well as a plaintiff's constitutional right to access to the courts. The administrative state been allowed to become so powerful, especially in Vermont in the case of the VPUC, through the judiciary's abdication of its constitutional role—instead choosing to defer to agency decisions. *Chevron*'s deference regime is unlawful. *Chevron* "deserves a tombstone no one can miss." *Buffington v. McDonough*, No 21-972, 598 U.S. __ (November 7, 2022) (*Gorsuch, J*. dissenting). The case against interpretive deference to agencies has been made by multiple courts and a majority of sitting Supreme Court justices, and appears set to be overturned next Supreme Court Term. *See, Loper Bright Enterprises v. Raimondo*, No. 22-451, *cert. granted* May 1, 2023, 143 S. Ct. 2429; *Relentless, Inc. v. Dep't of Commerce*, No. 22-1219, *cert. granted* October 13, 2023.

it is engaged in a legislative, policy-making process.") (Quotation omitted); *In re Conservation Law Found.*, 2018 VT 42, 15, 207 Vt. 309, 188 A.3d 667 ("Out of respect for the expertise and informed judgment of agencies, and in recognition of this Court's proper role in the separation of powers, we accord agency decisions substantial deference."); *In re Acorn Energy Solar 2, LLC*, 2021 VT 3, ¶22 ("We employ a deferential standard of review to both an agency's interpretation of a statute within its area of expertise, and an agency's interpretation of its own regulations.") (Internal citations and quotations omitted.)

32.    The Vermont Supreme Court issued its mandate affirming the VPUC on June 4, 2021.[8]

33.    Still worse, when Plaintiffs then asked to move the Chelsea and AHS projects to a different site in the same Town, approximately 3 miles away (where under a new state law the Town of Bennington designated certain parcels that where automatically approved from a siting perspective), the VPUC said no to that too.[9]  Making matters even worse still, when the VPUC subsequently denied the CPG for the AHS project, CS filed a Rule 60 motion with the VPUC saying that now that you denied AHS a CPG, can't we use that line that AHS already paid for the CS project since you now won't let Apple Hill build its generating facility?  The VPUC said no to that too.[10]

34.    The VPUC said CS had until June 4, 2023, to come up with a plan to interconnect to the GMP grid using a completely independent way (contrary to the FERC's interconnection rules), and, by the way, has to do so in a new and completely re-litigated CPG proceeding, causing tens of thousands of additional needless costs and years more time.  After exploring numerous interconnection alternatives with GMP after the Vermont Supreme Court's affirmance, CS complied with the VPUC's direction by filing a new petition for a CPG on January 25, 2023 (even

---

[8] *See, In re Petition of Chelsea Solar LLC*, 2021 VT 27 P28; 214 Vt. 526, 254 A.3d 156 (Vt. 2021) for the related opinion.

[9] *Petition of Chelsea Solar LLC for contingent amendment to standard-offer purchase power agreement*, Case No. 21-3192-PET, 2022 VT. PUC LEXIS 142 (Vt. Pub. Util. Comm'n February 8, 2022) (*Roisman, Cheney, Js.*)

[10] *Petition of Chelsea Solar LLC*, Case No. 17-5024, 2021 VT. PUC LEXIS 698 (Vt. Pub. Util. Comm'n August 31, 2021) (*Roisman, Cheney, Js.*)

though that requires GMP to ignore the FERC's least-cost rules regarding wholesale sale interconnections and PURPA's interconnection rules.)

35.    But then recently on October 24, 2023, the VPUC reneged on its promise that CS could file an amended petition and keep its Standard Offer contract, after CS invested substantial additional sums in reliance on the VPUC's commitment. *See*, **Exhibit C**, *Petition of Chelsea Solar LLC for extension of standard-offer contract commissioning deadline milestone*, Case No. 23-1138-PET, 2023 Vt. PUC Lexis 844 (Vt. Pub. Utils. Comm'n Oct 24, 2023).

36.    Worst still, the Defendants' rationale for why they were reneging on their promise requires them to disavow factual positions told to the Second Circuit in *Roisman*, positions that they had claimed should have resulted in affirmance. But since the Second Circuit rejected the Defendants legal position even assuming the Defendants' factual assertions were true, the Defendants now, in what has become a no-holds barred crusade against Plaintiffs, have no hesitation to now claim that what they told the Second Circuit was false.

37.    The Defendants' unlawful implementation of PURPA substantially increases the potential for loss of Plaintiffs' eligibility for publicly conferred benefits. Here, those benefits are the Vermont standard offer contracts, the "must-take" PURPA benefits available to owners and operators of QF solar facilities and the special status and preferred rights conferred on qualified small power producers ("QSPPs"), such as Plaintiffs, in order to encourage QSPPs to develop QFs. The inability to obtain the opportunity to benefit from those publicly conferred benefits that aid in the develop of QFs in a State, such as Vermont, is itself a clear injury to Plaintiffs.

38.    Defendants' unlawful actions have increased costs for Plaintiffs, taken away the Standard Offer contracts executed for CS and AHS, denied the CPG that the Defendants concede CS is entitled to, and taken Plaintiffs' investment in the CS and AHS projects—resulting in Plaintiffs suffering an injury-in-fact.

39.    But for the Defendants' unlawful and discriminatory 2.2MW plant size limit, the Defendants' unlawful aggregation of the sizes of separate QFs in calculating the 2.2MW plant size limit and its requiring Plaintiffs and GMP to ignore the FERC-mandated interconnection rules,

11

Plaintiffs would have received a CPG for the CS project, would not have incurred extra costs, and would not have had their investments and contracts taken.

40.     A favorable ruling in Plaintiffs' favor, declaring the Defendants' unlawful and discriminatory 2.2MW plant size limit, the Defendants' unlawful aggregation of the sizes of separate QFs in calculating the 2.2MW plant size limit and its requiring Plaintiffs and GMP to ignore the FERC-mandated interconnection rules to be preempted and requiring Vermont and the Defendants to implement PURPA and the Federal Power Act in a manner consistent with federal regulations, would redress that injury-in-fact.

41.     The Plaintiffs also intend to seek additional contracts for QFs from VEPP in the future and a ruling in favor of Plaintiffs would ensure that the Plaintiffs are able to obtain those contracts and permits for the projects with the Defendants being required to observe federal law.

42.     The Defendants' sole authority to regulate wholesale electricity sales derives from PURPA. Therefore, any orders it issues must be consistent with PURPA and FERC's regulations implementing PURPA and the Federal Power Act, 16 U.S.C. §791a *et seq.* (the "FPA"). Because VPUC's orders are, in those certain respects, in conflict with governing federal law, the orders are preempted and must be declared invalid.

43.     Plaintiffs also seek injunctive relief requiring the Defendants to re-issue the 2019 CS Order, **Exhibit D** hereto, *nunc pro tunc* so that it grants the CPG to CS that the Defendants agreed CS was entitled to, and would have received, but for the Defendants' unlawful and preempted actions.

44.     Additionally, the Plaintiffs seek injunctive relief enjoining the Defendants from applying those aspects of its orders in the future. Specifically, the Defendants are proposing to apply its unlawful actions and Standard Offer rules challenged here to other QFs owned by Allco in Bennington, Vermont, called the Warner Solar project, the Battle Creek Solar project and the Stark Solar project.

## PARTIES

45.     Allco Finance Limited is a Florida corporation. Allco is the owner and operator of

various operating small power production facilities within the meaning of Section 210(l) of PURPA, including Chelsea Solar (QF13-437-000) and Apple Hill Solar (QF13-436-000). Allco is a "qualifying small power producer" within the meaning of Section 210(h)(2)(B) of PURPA. Allco would participate in a PURPA-compliant solicitation if the VPUC were required to adhere to the requirements of PURPA. Allco has been involved in numerous challenges under PURPA. *See, e.g., Winding Creek Solar LLC v. Peterman*, 932 F.3d 861 (9th Cir. 2019) (declaring California's implementation of PURPA under its Re-MAT program invalid); *Allco Renewable Energy Ltd. v. Mass. Elec. Co.*, 208 F. Supp. 3d 390 (D. Mass. 2016) *aff'd* 875 F.3d 64 (1st Cir. 2017) (declaring Massachusetts' implementation of PURPA invalid); *Windham Solar LLC*, 156 FERC ¶61,042 (2016), *Windham Solar LLC,* 157 FERC ¶61,134 (2016) (declaring Connecticut's implementation of PURPA invalid); *Allco Finance Limited v. Roisman*, No. 22-2276, 2023 U.S. App. LEXIS 18179 (2d Cir. July 18, 2023) (challenging Vermont's implementation of PURPA and vacating the District Court's dismissal of the complaint).

46.     Chelsea Solar LLC is a Vermont limited liability company whose single member is Allco. The Chelsea Solar project is a 2.0MW solar project located in Bennington, Vermont, QF13-437-000. Chelsea Solar LLC is party to wholesale sale contract dated June 20, 2013 for the sale of its energy and capacity to VEPP Inc. acting as agent for the Vermont utilities. *See*, **Exhibit A**. VEPP wheels the non-GMP share of the energy purchased under the contract pursuant to ISO-New England's transmission rules to the other Vermont utilities.

47.     Apple Hill Solar LLC is a Vermont limited liability company whose single member is Allco. The Apple Hill Solar project is a 2.0MW solar project located in Bennington, Vermont, QF13-436-000. Apple Hill Solar LLC is party to wholesale sale contract dated May 12, 2014 for the sale of its energy and capacity to VEPP Inc. acting as agent for the Vermont utilities. *See*, **Exhibit B.**

48.     Under 18 C.F.R. § 292.207(a), a "proposed facility" is expressly permitted to self-certify as a "qualifying facility" by filing Form 556. As explained in *Winding Creek Solar LLC v. Peevey*, Case No. 13-cv-04934-JD, 2015 WL 675388, 2015 U.S. Dist. LEXIS 18887 (N.D. Cal.

13

February 17, 2015) a qualifying small power production facility includes un-built facilities that meet the renewable source, size and self-certification requirements, which are all met here for facilities not yet built. The FERC Form 556 requires the operator of the un-built facility to be listed, and FERC's regulations permit the "operator" of an un-built facility to file the Form 556 in order to obtain PURPA benefits. *See*, 18 C.F.R. § 292.207. Each un-built facility has an operator and an owner, either one of which is entitled to file Form 556 to obtain QF status.

49.    Defendant Anthony Roisman is Chair of the VPUC and is sued in his official capacity.

50.    Defendant Riley Allen is Commissioner of the VPUC and is sued in his official capacity.

51.    Defendant Margaret Cheney is Commissioner of the VPUC and is sued in her official capacity.

## JURISDICTION AND VENUE

52.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action brings claims arising under federal law.

53.    This Court also has subject matter jurisdiction over this action because, under 16 U.S.C. § 824a-3(h)(2)(B), a "qualifying small power producer," after first petitioning FERC, may bring an enforcement action in a United States district court against a State regulatory authority to enjoin violations of, and ensure compliance with, PURPA and FERC's regulations promulgated pursuant to PURPA.

54.    As explained above, each Plaintiff is a "qualifying small power producer" under PURPA.[11]

55.    Each Plaintiff has also satisfied the administrative exhaustion requirements of 16 U.S.C. § 824a-3(h)(2)(B). On August 14, 2023, Plaintiffs filed a petition for enforcement pursuant

---

[11] In the case of Plaintiff Allco, three decisions of the Second Circuit have accepted Allco's status as a QSPP. *Allco Finance Ltd. v Klee*, 805 F.3d 89 (2d Cir. 2015), *Allco Finance Ltd. v. Klee*, 861 F.3d 82 (2d Cir. 2017) and *Allco Finance Limited v. Roisman*, No. 22-2276, 2023 U.S. App. LEXIS 18179 (2d Cir. July 18, 2023).

to section 210(h)(2) of PURPA (the "FERC Petition") against the Vermont Public Utility Commission to remedy alleged improper implementation of PURPA. *See*, FERC Docket EL23-92-000.

56.     On October 13, 2023, the FERC issued a notice that it would not initiate an enforcement action under section 210(h)(2) of PURPA and authorized the Plaintiffs to bring such action. *See*, *Allco Finance Limited*, 185 FERC ¶ 61,006 (2023).

57.     The Court is empowered to grant declaratory relief by 28 U.S.C. §§ 2201 and 2202 and Rule 57 of the Federal Rules of Civil Procedure.

58.     This Court is empowered to grant preliminary and permanent injunctive relief by, *inter alia*, 28 U.S.C § 2202; Rule 65 of the Federal Rules of Civil Procedure; and *Ex Parte Young*, 209 U.S. 123 (1908).

59.     This Court is empowered to grant injunctive relief *and all other appropriate relief* under PURPA section 210(h)(2)(B).

60.     This Court has personal jurisdiction over Defendants because each Defendant conducts a substantial portion of his or her duties as an officer of VPUC in the District of Vermont. VPUC is located at 112 State Street, Montpelier, VT 05620.

61.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because a substantial part of the events giving rise to this action occurred in the District of Vermont.

### CLAIMS FOR RELIEF
### COUNT I: PREEMPTION
### (Violation of the Supremacy Clause of the U.S. Constitution)

62.     Plaintiffs restate and incorporate by reference each and every allegation in preceding paragraphs of this Complaint as if fully set forth herein.

63.     Under the Supremacy Clause of the United States Constitution, a state law or regulation is preempted when Congress intends federal law to occupy the field, as well as in cases where the state law conflicts with federal statutes or regulations, or where the state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

64.     Under the Supremacy Clause, state laws or regulatory orders that conflict with federal law or that "stand as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000), are preempted and invalid. *See Pac. Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 204 (1983) ("Even where Congress has not entirely displaced state regulation in a specific area, state law is preempted to the extent that it actually conflicts with federal law."). Federal regulations with the force of law have the same preemptive power as a federal statute. *City of N.Y. v. FCC*, 486 U.S. 57, 63-64 (1988).

65.     In passing the Federal Power Act, Congress intended FERC to have exclusive jurisdiction over the field of wholesale electricity sales. The Federal Power Act left no power in states to regulate wholesale electricity pricing or sales. *See also, Allco Finance Ltd. v. Klee*, 805 F.3d 89, 91 (2nd Cir. 2015) ("States may not act in [wholesale sale of electricity] this area unless Congress creates an exception. *Id.* § 824(b).") In 1978, Congress enacted section 210 of PURPA, codified at 16 U.S.C. § 824a-3, which created a limited role for States in regulating certain wholesale transactions.   Other than the authority granted to the States in PURPA, States have no other authority to set wholesale electricity rates or regulate wholesale electricity transactions.

66.     Because a State's *only* authority to regulate wholesale electricity sales is derived from section 210 of PURPA, any State rule that conflicts with those requirements is necessarily preempted.

67.     The Defendants' unlawful and discriminatory 2.2MW plant size limit, the Defendants' unlawful aggregation of the sizes of separate QFs in calculating the 2.2MW plant size limit and its requiring Plaintiffs and GMP to ignore the FERC-mandated interconnection rules, all violate and conflict with PURPA and the Federal Power Act.

68.     The discriminatory size cap imposed by the VPUC's administration of the Standard Offer program is plainly unlawful under PURPA and thus pre-empted. *See, Winding Creek.,* 932 F.3d at 865 (a "cap on the amount of energy utilities must purchase from QFs is impermissible

under PURPA's must-take provision. [With a cap], a utility could purchase less energy than a QF makes available, an outcome forbidden by PURPA.").

69.     Moreover, because the Defendants' 2.2MW plant size limit, the unlawful aggregation of the sizes of separate QFs in calculating the 2.2MW plant size limit and their requiring Plaintiffs and GMP to ignore the FERC-mandated interconnection rules, are not authorized by PURPA, they fall outside the narrow exception that Congress has given to States to regulate wholesale electricity sales. Except for the authority granted by PURPA, States are without power to regulate wholesale electricity sales; the field of wholesale regulation is, with the exception of PURPA, reserved exclusively for FERC. For that reason, too, the Defendants' 2.2MW plant size limit, the unlawful aggregation of the sizes of separate QFs in calculating the 2.2MW plant size limit and their requiring Plaintiffs and GMP to ignore the FERC-mandated interconnection rules are preempted.

70.     Because the Defendants' administration of the Standard Offer program conflicts with federal regulations under PURPA and are an obstacle to the achievement of Congress' policy in enacting PURPA, and because the Defendants has no authority to regulate wholesale electricity transactions other than that given by PURPA, the Vermont statute and the Defendants' administration of the Standard Offer program implementing a 2.2MW plant size limit, an aggregation of the sizes of separate QFs in calculating the 2.2MW plant size limit and their requiring Plaintiffs and GMP to ignore the FERC-mandated interconnection rules, are preempted by federal law and violate the Supremacy Clause of the U.S Constitution.

71.     Plaintiffs will suffer irreparable harm by virtue of Vermont's and the Defendants' violation of the Supremacy Clause, because Plaintiffs will continue to be unable to enter into contracts at the terms and conditions guaranteed by federal law, Plaintiffs will incur increase costs, Plaintiffs are at increased risk for loss of their investments and contracts, and Plaintiffs will continue to not have the CPG for the Chelsea project, and are without any adequate remedy at law and no opportunity for compensation for Vermont's and the Defendants' violation of the Supremacy Clause.

72.     A ruling in Plaintiffs' favor, declaring the challenged regulatory actions void and unlawful, would redress those injuries by providing the Plaintiffs with the opportunity to participate in a compliant process to obtain a contract under the Standard Offer program and would reverse the Defendants' cancelation of a benefit that would aid Plaintiffs in reducing its costs, maintaining its contracts and investments, aid in obtaining a CPG for the CS project and Allco's other similarly situated projects in Bennington, aid in obtaining a contract for the sale of its energy from facilities to be developed, aid in obtaining revenues that they are entitled to receive for the sale of electricity, and aid in the development of QFs.

73.     If the Defendants' unlawful regulatory actions are nullified, then the Plaintiffs would have decreased costs, increased likelihood of projects being built, a decrease in the risk of losses to Plaintiffs, an increased likelihood of the opportunity to participate in a compliant process to obtain a contract under the Standard Offer program, and increased opportunities.

74.     Plaintiffs are entitled to judgment under 28 U.S.C. §§ 2201(a) and 2202, declaring that the Vermont statute and the Defendants' orders and its administration of the Standard Offer program implementing a 2.2MW plant size limit, an aggregation of the sizes of separate QFs in calculating the 2.2MW plant size limit and their requiring Plaintiffs and GMP to ignore the FERC-mandated interconnection rules violates the Supremacy Clause (Article VI, Clause 2) of the United States Constitution.

## COUNT II: UNLAWFUL TAKING
### (Violation of the Fifth and Fourteenth Amendments to the U.S. Constitution and 42 U.S.C. § 1983)

75.     Plaintiffs restate and incorporate by reference each and every allegation in preceding paragraphs as if fully set forth herein.

76.     The Takings Clause of the Fifth Amendment, applicable to the States through the Fourteenth Amendment, provides: "[N]or shall private property be taken for public use, without just compensation." The Founders recognized that the protection of private property is indispensable to the promotion of individual freedom. As John Adams tersely put it, "[p]roperty must be secured, or liberty cannot exist." Discourses on Davila, in 6 Works of John Adams 280 (C. Adams ed. 1851). This Court agrees, having noted that protection of property rights is "necessary to preserve freedom" and "empowers persons to shape and to plan their own destiny in a world where governments are always eager

18

to do so for them." *Murr v. Wisconsin*, 582 U. S. ___, ___, 137 S. Ct. 1933, 198 L. Ed. 2d 497, 509 (2017).

*Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071 (2021) ("*Cedar Point*").

77.     "[P]eople still do not expect their property, real or personal, to be actually occupied or taken away." *Id.* at 2074 (internal citation and quotation omitted). The Takings Clause protects against uncompensated takings of personal, as well as real, property. *Horne v. Dep't of Agriculture*, 135 S. Ct. 2419, 2425-26 (2015).

78.     The Defendants' denial of the CPG to CS on the basis of its complete about-face on a regulatory issue and on a basis prohibited by federal law constitutes an unlawful taking of Plaintiffs' property—i.e., its investments made in the Chelsea Solar project.

79.     The Defendants' denial of the extension of the CS Standard Offer contract based upon its about-face on CS's right to file a new petition and keep its Standard Offer contract constitutes an unlawful taking of Plaintiffs' property—i.e., its further investments made in the Chelsea Solar project.

### *There Is No Proper Remedy In Vermont State Court*

80.     While not justified by the text or structure of the self-executing nature of the Fifth or Fourteenth Amendments to the United States Constitution, several courts have held that the Fifth Amendment as incorporated against the States through the Fourteenth Amendment only trumps a State's Eleventh Amendment immunity if a State does not provide its own remedy. *See, 74 Pinehurst LLC v. New York*, 59 F.4th 557, 570 (2d Cir. 2023) ("sovereign immunity trumps the Takings Clause where, as here, the state provides its own remedy for an alleged violation.") *But see*, *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 714 (1999) (questioning whether immunity "retains its vitality" in the takings context). Nevertheless, the United States Supreme Court has "surprisingly" never directly resolved the conflict between sovereign immunity and the Just Compensation Clause. Richard H. Seamon, *The Asymmetry of State Sovereign Immunity*, 76 Wash. L. Rev. 1067, 1067-68 (2001); Eric Berger, *The Collision of the Takings and State Sovereign Immunity Doctrines*, 63 Wash. & Lee L. Rev. 493, 496 (2006) (the Court has

"avoided the issue"); *Community Housing Improvement Program v. City of New York (CHIP)*, 492 F. Supp. 3d 33, 40 (E.D.N.Y. 2020) (noting the Court has not "decisively resolved the conflict").

81.     There is nothing in the text or the structure of the Fifth and Fourteenth Amendments that supports the notion that the Fourteenth Amendment only springs into action against the Eleventh Amendment when the State does not provide an adequate remedy.

82.     But even if there were, here Vermont does not provide an adequate remedy.  While Vermont does provide a remedy of sorts, *see Ondovchik Family Ltd. P'ship v. Agency of Transp.*, 2010 VT 35, ¶14, 187 Vt. 556, 996 A.2d 1179, it is wholly inadequate in a case involving an administrative agency such as the VPUC.

83.     The reason is that, as described above, Vermont courts employ a *Chevron* on steroids deference to administrative agencies.  This Court cannot defer to the VPUC, nor can it look to the Vermont state courts which will defer to the VPUC's view of its own powers and application and interpretation of the law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court enter an Order:

a.     declaring that the Vermont statute and the Defendants' orders and its administration of the Standard Offer program implementing a 2.2MW plant size limit, an aggregation of the sizes of separate QFs in calculating the 2.2MW plant size limit and their requiring Plaintiffs and GMP to ignore the FERC-mandated interconnection rules violate the Supremacy Clause (Article VI, Clause 2) of the United States Constitution; and enjoining the Defendants from applying those aspects of its orders in the future, including with respect to CS, AHS and other QFs owned by Allco in Bennington, Vermont, called the Warner Solar project, the Battle Creek Solar project and the Stark Solar project

b.     declaring that it was unlawful for the Defendants to deny the CPG for the CS project in its 2019 Order on the basis that it did;

c.     enjoining the Defendants to re-issue their 2019 Order, **Exhibit D**, *nunc pro tunc* but

this time granting the CPG;

d.   declaring that the Defendants' denial of the CPG to CS on the basis of its complete about-face on a regulatory issue and on a basis prohibited by federal law constitutes an unlawful taking of Plaintiffs' property;

e.   declaring that the Defendants' denial of the extension of the CS Standard Offer contract based upon its about-face on CS's right to file a new petition and keep its Standard Offer contract constitutes an unlawful taking of Plaintiffs' property.

f.   enjoining Defendants to issue new orders requiring the Defendants to implement PURPA in a manner consistent with federal law; and

g.   awarding Plaintiff such further relief as the Court may deem just and equitable.

Dated: December 7, 2023                THE PLAINTIFFS,

_____

Thomas Melone
Allco Finance Limited
157 Church St., 19th floor
New Haven, CT 06510
Phone: (212) 681-1120
Email: Thomas.Melone@AllcoUS.com

*Attorney for Plaintiffs*